THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KURT JONES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 20 C 4884 |
| ) | |
| BOARD OF EDUCATION OF THE CITY ) | Judge Joan H. Lefkow |
| OF CHICAGO; JANICE JACKSON, in her ) | |
| capacity as CEO of Chicago Public Schools; ) | |
| MARY ERNESTI, in her capacity as ) | |
| Director of Employment Engagement for ) | |
| Chicago Public Schools; and DR. ) | |
| ZIPPORAH HIGHTOWER, in her capacity ) | |
| as Executive Director, Department of ) | |
| Principal Quality, ) | |
| ) | |
| Defendants. ) | |

## OPINION AND ORDER

Kurt Jones has sued the Board of Education of the City of Chicago ("the Board") and several of its officers in their official capacity, claiming that he was constructively terminated as principal of the Franklin Fine Arts Center ("Franklin") without due process and seeking his reinstatement (or, as he puts it, continuation in his position). In anticipation of the new school year and Franklin's imminent hiring of a new principal, Jones moves for a temporary restraining order reinstating him as principal of Franklin and enjoining Franklin from signing a contract with a new principal pending a hearing on a motion for preliminary injunction. For the reasons below, the motion (dkt. 10) is denied.[1]

---

[1] This court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. Venue lies under 28 U.S.C. § 1391(b).

## BACKGROUND[2]

Until recently, Jones was the principal of Franklin, an elementary school in the Chicago Public Schools ("CPS") system. (Dkt. 1-1 ¶ 1.) Jones was hired in 2016 for a four-year term ending June 30, 2020, which then was renewed until 2024. (Dkt. 1-1 ¶ 1.) To that end, in January 2020, Jones and the Board executed a written contract. (Dkt. 11-1 at 37.)[3] The contract provided that Jones would continue to serve as principal of Franklin until June 30, 2024. (*Id.* at 37–44.) The contract could be terminated on any of seven conditions, of which two are relevant here: (1) removal for cause under Section 34-85 of the Illinois School Code, 105 Ill. Comp. Stat. 5/34-85; or (2) resignation. (*Id.* at 40.) Section 34-85 sets forth a rigorous process that requires high-level approval of charges, written notice of charges, the right to select among a list of qualified hearing officers, pre-hearing disclosure and discovery rights, the right to counsel at a hearing, and the right to present, compel appearance of, and cross-examine witnesses at the hearing. 105 Ill. Comp. Stat. 5/34-85(a)(1)–(9).

Jones alleges that "[i]n March 2020, while engaging in physical activities with essential staff of Franklin at Franklin, an African American employee was accidentally injured." (Dkt. 1-1 ¶ 2.) Jones does not explain how the employee was injured, and the Board's written notice of potential charges merely claims that Franklin's lunchroom manager Faye Jenkins sustained a cut over her right eye during a dodgeball game on school grounds during work hours in which Jones participated. (Dkt. 11-1 at 46, 49.) The Board asserts in response to this motion that Jones

---

[2] The facts are taken from Jones's verified complaint, which under Illinois law swears all allegations under oath and therefore functions as an affidavit in this court, *Ford* v. *Wilson*, 90 F.3d 245, 246–47 (7th Cir. 1996), along with other affidavits and exhibits.

[3] Jones filed the exhibits to the motion as a single docket entry with separately labeled exhibits. Some different exhibits share the same label—there are, for instance, two Exhibit E's. To avoid confusion, the court refers to the overall page number within docket entry 11-1, rather than exhibit label or the page numbers that appear on the individual exhibits.

himself injured Jenkins by throwing a plastic object at her. (Dkt. 20 ¶ 17.) The Board also submits an investigative report documenting its evidence for this claim (and others). (Dkt. 18-1.) Jones now faces felony aggravated battery charges arising out of the incident and thus declines to comment based on his privilege against self-incrimination. Recognizing this, the court avoids determining at this point whether it is likely that Jones committed the conduct of which he was accused.

Jenkins filed a report with CPS, which opened an investigation of the incident. (*Id.* ¶ 38.) The investigation broadened as investigators uncovered allegations that Jones had engaged in earlier wrongdoing, though he had never been charged or disciplined. (*Id.* ¶¶ 39–40.) On April 13, 2020, someone from CPS interviewed Jones informally about the earlier incidents. (Dkt. 1-1 ¶ 3.) On May 11, 2020, defendant Dr. Hightower sent Jones a letter entitled "Pre-Meeting Notice Form." (Dkt. 11-1 at 46–47.) The letter advised Jones that a CPS Law Department investigation had uncovered four categories of misconduct allegations:

1. Conduct unbecoming a Board employee: Jones had injured Jenkins during an unsanctioned game of dodgeball on school premises during work hours.

2. Unprofessional conduct: This umbrella allegation contained three specific claims. First, Jones engaged staff in "scary time," where Jones and others would hide with the intention of jumping out and scaring staff members. Second, he called a Franklin staff member a "dizzy ho" in front of other staff. Third, he threw food at and around Franklin staff.

3. Creating a hostile work environment: Over multiple school years, Jones, a white man, used epithets toward nonwhite staff members.

4. Unprofessional conduct with parents of Franklin students: Over multiple school years, Jones threatened to report parents to the Illinois Department of Children and Family Services.

(Dkt. 11-1 at 46.) Hightower invited Jones to a meeting on May 14, 2020 to discuss his conduct and notified him that the meeting could result in penalties up to a recommendation for Jones's

3

dismissal. (*Id.* at 47.) Hightower also notified Jones that he had a right to have a legal representative present at the meeting. (*Id.*) The next day, Hightower sent Jones documents from the investigative file. (*Id.*)

At the May 14, 2020 meeting, Jones delivered a written response to the notice and the evidence against him that Hightower had sent. (Dkt. 11-1 at 49.) Jones "accept[ed] full responsibility for his professional choice to engage in [h]orseplay during the work day identified in the report, March 22, 2020." (*Id.*) He noted, however, that there were no children present and that Jenkins was injured during a voluntary game of dodgeball in which she was a willing participant. (*Id.* at 49–50.) Jones also admitted to participating in "scary time" but explained that other staff would sometimes play "scary time" when he was not present. (*Id.* at 50.) Jones denied all allegations of harassing statements to staff and parents. (*Id.* at 50–54.) Jones also responded to the charges orally at the meeting with Hightower and CPS Deputy General Counsel Libby Massey. (Dkt. 1-1 ¶ 6.) Jones did not have a legal representative present. (*Id.*)

On June 17, 2020, someone from CPS contacted Jones requiring him to participate in another disciplinary meeting on June 19, 2020. (*Id.* ¶ 7.) Jones asserts that Massey and Matthew Lyons, CPS Chief Talent Officer, led him to believe the meeting would be informal but then sandbagged him, telling him that they had decided to terminate him because he posed too high a liability risk to remain employed. (*Id.* ¶ 8.) Jones claims that they then gave him an ultimatum: resign or be fired immediately. (*Id.*) They afforded him two days to choose, and while he sought an attorney to help him weigh his options, Hightower contacted him to abruptly shorten the decision window to twenty minutes. (*Id.* ¶¶ 9, 11, 49, 51.) Jones claims that he then resigned under duress. (*Id.* ¶ 12.)

4

The Board proffers a contrary account, supported with contemporaneous documentary evidence that makes Jones's account questionable. According to the Board, Massey invited Jones to a meeting on June 19 and reminded him explicitly and in writing that he had the right to bring a legal representative, which Jones declined. (Dkt. 18-2 ¶ 11; dkt. 18-2 Exh. 2.) In an affidavit, Massey states that she and Lyons did not tell Jones, as he claims, that they decided to terminate him but that the Board had decided to institute formal charges against him under Section 34-85 of the Illinois School Code after fully investigating and considering Jones's responses. (Dkt. 18-2 ¶¶ 9–10.) As a courtesy to Jones, the Board offered him the chance to resign quietly by June 21, 2020 rather than endure the stress and indignity of formal, public dismissal proceedings. (*Id.* ¶ 12.) Massey confirmed these options in an email after the meeting, telling Jones, "Please take time to consider your options and respond to me by 2:00 p.m. on Sunday. If we do not hear from you, we will plan to move forward with *filing termination charges* on Monday." (Dkt. 18-2 Exh. 3 (emphasis added).)

The Chicago *Sun-Times* motivated the Board to accelerate its deadline, as one of its reporters planned to publish an article about the incident and sought the Board's comment about whether it intended to take any action against Jones. (Dkt. 18-2 ¶ 17.) Massey learned about the *Sun-Times* reporter's inquiry at 3:41 p.m. on June 19. (*Id.*) Massey and Hightower called Jones that very minute to advise him that the Board now planned to send a statement to parents and staff before the *Sun-Times* published, and that the Board planned to comment that it had terminated Jones. (*Id.* ¶ 18; dkt. 21-1 Exh. C ¶ 6.) One minute after the call, Jones told Hightower by text message that he was working with an attorney on his resignation letter. The Board has submitted a copy of that text message into the record. (*Id.* ¶ 19; dkt. 20 Grp. Exh. 1) ("Thank you. My attorney is working on resignation statement. . . . I will e-mail as soon as he

5

sends it to me."). Thus, while Jones's timeline is correct, he was given a much more palatable ultimatum than he claims: resign or receive his full procedural rights under Section 34-85 of the Illinois School Code. Jones chose the former. (Dkt. 18-2 Exh. 3; Dkt. 20 Grp. Exh. 1.) At 4:02 p.m., Jones resigned by e-mail, stating, "[a]fter long thought and deep consideration, . . . I have come to the decision to resign from my position as Principal of Franklin Fine Arts Center." (Dkt. 18-2 Exh. 3.)

Contrary to his representation in the text message to Hightower, Jones now states that he did not hear back from an attorney until shortly after he resigned. (Dkt. 21-1 Exh. B ¶ 28.) The attorney advised him to rescind the resignation immediately. The next morning, Jones emailed the Board to rescind his resignation. (Dkt. 1-1 ¶ 52.) Lyons responded that Jones's resignation was irrevocable, and that the Board would not honor Jones's attempted rescission. (Dkt. 11-1 at 63.)

Defense counsel represents, and Jones does not dispute, that on June 25, 2020, Jones was arrested and charged with felony aggravated battery of a school employee. On June 26, 2020, defendant Ernesti notified Jones that she had placed a "do-not-hire" designation on his personnel file and provided instructions on how to challenge that designation. (Dkt. 11-1 at 71.) Massey states that the Board applies the designation to all employees who resign in anticipation of formal dismissal charges. (Dkt. 18-2 ¶ 24.) Jones asserts that this designation means exactly what it sounds like: He can no longer obtain employment with CPS. He does not state whether he has attempted to challenge the designation through other means, and Massey asserts that to her knowledge, Jones has not petitioned to remove the designation. (Dkt. 18-2 ¶ 25.)

Jones filed this action in the Circuit Court of Cook County on August 10, 2020. He brings five counts against all defendants: (1) Declaratory judgment; (2) Breach of the 2016–2020

contract; (3) Breach of the 2020–2024 contract; (4) Violation of procedural due process; and (5) Wrongful termination. (Dkt. 1-1.) Although the complaint itself explicitly mentions only the Illinois constitution, soon after filing the complaint, Jones filed a motion for preliminary injunction that also invoked federal constitutional protections. (Dkt. 1-3.) The Board notified Jones that based on that brief and some of the language in the complaint, it understood him to be suing at least in part under 42 U.S.C. § 1983 for violations of the Fourteenth Amendment's Due Process clause and invited him to amend his complaint to disclaim any federal issues if he wanted to keep the case in state court. (Dkt. 1-2.) Jones did not amend his complaint, and the Board filed its notice of removal before the circuit court heard the motion for preliminary injunction. (Dkt. 1.)[4]

After the case was removed, Jones discovered that Franklin intended to complete interviews of candidates to replace Jones by August 31, 2020, with the goal of hiring a replacement by September 1, 2020. (Dkt. 11-1 at 173.) Jones thus filed a motion for temporary restraining order to "enjoin[] Defendants from formally enforcing their constructive termination of Mr. Jones' employment with CPS by appointing a new principal of Chicago's Franklin Fine Arts Center . . . and from rejecting Mr. Jones' rescission of his tendered involuntary resignation." (Dkt. 10 at 1.) At this writing, the Board has not hired a replacement principal for Franklin but expresses urgency in its need to do so. (Dkt. 20 ¶ 30.)

---

[4] In any event, his constitutional claims must be federal, as there is no private right of action for violations of the Illinois Constitution's Due Process Clause. *Jacobson* v. *Nat'l R.R. Passenger Corp.*, No. 97 C 6012, 1999 WL 1101299, at *11–12 (N.D. Ill. Nov. 29, 1999),

7

## **LEGAL STANDARD**

The standard for seeking a temporary restraining order and a preliminary injunction are the same. *USA-Halal Chamber of Commerce, Inc.* v. *Best Choice Meats, Inc.*, 402 F. Supp. 3d 427, 433 n.5 (N.D. Ill. 2019). A party seeking a temporary restraining order must demonstrate that: (1) its claim has "a better than negligible" likelihood of success on the merits; (2) traditional legal remedies would be inadequate; and (3) absent injunctive relief, it will suffer irreparable harm in the period prior to final resolution of its claim. *Girl Scouts of Manitou Council* v. *Girl Scouts of the U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the moving party satisfies these threshold requirements, the court must balance the threatened injury to the moving party with the threatened harm the injunction may inflict on the nonmovant. *Id*. The court also must consider the public interest in either the grant or denial of the injunctive relief. *Id*. In applying these criteria, the court uses a "sliding scale" approach: if a claim is very likely to succeed on the merits, less harm to the plaintiff will be required to justify injunctive relief and vice versa. *Abbott Labs.* v. *Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992).

## **ANALYSIS**

### I. Likelihood of Success on the Merits

Jones's due process claim asserts that defendants have interfered with his property interest in his employment by requiring him, on unreasonably short notice and before presenting him with formal charges according to Section 34-85 of the Illinois School Code, to resign or be fired and by refusing to accept his retraction of his resignation, (Dkt. 11-1 ¶¶. T95-101).[5]

---

[5] "Procedural due process claims require a two-step analysis. The first step requires us to determine whether the plaintiff has been deprived of a protected interest; the second requires a determination of what process is due." *Strasburger* v. *Bd. of Educ. Hardin Cty. Comm. Unit Sch. Dist. No. 1*, 143 F.3d 351, 358 (7th Cir. 1998). The Board does not dispute that Jones had a property interest in his employment.

8

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 1493 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313, 70 S. Ct. 652, 656 (1950)). *Loudermill* sets out the process due in the context of public employment:

> [T]he pretermination hearing need not definitively resolve the propriety of the discharge. It should be an initial check against mistaken decisions—essentially, a determination of whether there are reasonable grounds to believe that the charges against the employee are true and support the proposed action. … The tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story. To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee.

*Id.* at 545–46. If, however, "a public employee terminated for cause has a present entitlement, and when the only available post-termination remedy is the opportunity to bring a state breach of contract suit, the pre-termination hearing to which such an employee is entitled must fully satisfy the due process requirements of confrontation and cross-examination in addition to the minimal *Loudermill* requirements of notice and an opportunity to be heard." *Baird* v. *Bd. of Educ. for Warren Cmty. Unit Sch. Dist. No. 205*, 389 F.3d 685, 692 (7th Cir. 2004). A school administrator's right to continued employment under a contract is a "present entitlement." *Id.*

But the government owes no procedures to public employees who quit. Thus, if Jones resigned voluntarily, "there is no deprivation [of a property interest] and so no right to a hearing." *Patterson* v. *Portch*, 853 F.2d 1399, 1406 (7th Cir. 1988). Jones tendered his resignation on June 19, 2020 but claims that he did so involuntarily and thus was constructively discharged without due process. If the Board gave him an ultimatum to resign or be fired immediately, Jones might have some chance of proving constructive discharge because such an

9

ultimatum is an involuntary termination even if the employee chooses to resign. *Dean* v. *Dunlap Cmty. Unit Sch. Dist. No. 323*, No. 11 C 1194, 2011 WL 7437931, at *4 (C.D. Ill. Nov. 7, 2011), *report & rec. adopted*, 2012 WL 668550 (C.D. Ill. Feb. 28, 2012). Under such circumstances, the employer has already decided that the employment is terminated, and the employee's choice of how to terminate the employment is in no sense a voluntary decision. *Id.*; *see also Piper* v. *Bd. of Trs. of Cmty. College Dist. No. 514*, 426 N.E.2d 262, 265, 99 Ill. App. 3d 752 (1981) (holding that under Illinois law, resignation after resign-or-be-fired ultimatum is involuntary termination). If, on the other hand, the Board gave him an ultimatum to resign or face dismissal charges, Jones's choice to resign was voluntary. *Graehling* v. *Village of Lombard*, No. 94 C 4084, 1994 WL 698525, at *8 (N.D. Ill. Dec. 12, 1994) ("[W]here an employer leaves the employee with a choice to 'stand pat and fight,' the resignation is not considered coerced." (quoting *Alvarado* v. *Picur*, 859 F.2d 448, 453 (7th Cir. 1988)). Under such circumstances, the employee has a chance to keep his job if he beats the charges; resigning is a voluntary choice not to try to keep the job. *Id.*

The evidence viewed most favorably to Jones suggests that when he met with Massey on June 19 he was given little time to make the decision he made, a decision he now regrets. At that, there is no evidence before the court indicating that he asked for more time or otherwise indicated resistance to the Board's later-expressed intention, in light of the *Sun-Times*'s inquiry, to immediately inform the school community of its intention to terminate him. Moreover, Massey's email demonstrates that Jones was given the option to resign or try to keep his job— not, as he claims, resign or be fired immediately. The Board told him that it would start Section 34-85 proceedings the following Monday, and this was his last chance to resign quietly. That

10

choice was unpleasant but not coercive. *Graehling*, 1994 WL 698525, at *8. These facts make his claim that he was under duress from the Board unconvincing.

As such, the court must conclude there is less than minimal likelihood of success on the merits of plaintiff's due process claim.

## II.    Irreparable Harm and Lack of Legal Remedy

For the sake of completeness, the court considers the remaining factors for a temporary restraining order and preliminary injunction. The court does not minimize the hardship of unemployment and its potential consequences. The Seventh Circuit, however, has ruled that irreparable injury does not include loss of income, inability to find other employment, or financial distress. *EEOC* v. *City of Janesville*, 630 F.2d 1254, 1259 (7th Cir. 1980). Jones may suffer intangible harms of being denied the chance to pursue his chosen vocation, especially because CPS has designated him as "do-not-hire." *Baird*, 389 F.3d at 692 ("'[E]mployment, especially in a career such as education, is more than a way to make money; it is a profession with significant non-monetary rewards,' and consequently money damages may be a 'hollow victory.'") (quoting *Banks* v. *Burkich*, 788 F.2d 1161, 1164 (6th Cir. 1986)). Moreover, without a restraining order, Franklin likely will hire a new principal to replace Jones while the litigation is pending, meaning that, a final judgment could help restore him to a similar position, but likely not the same one. (Dkt. 11-1 at 173.) These limited irreparable injuries are not grave enough to justify interlocutory injunctive relief.

## III.    Balance of the Equities and Public Interest

The balance of the equities weighs against reinstating Jones. This is because "giving a plaintiff a particular job while the litigation continues has potentially high costs for the employer if the plaintiff eventually loses, for in the interim the employer will have lost control of the

11

workplace and may disburse salary that cannot be recouped[.]" *Webb*, 167 F.3d at 1149; *see also, e.g.*, *E. St. Louis Laborers' Local 100* v. *Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705 (7th Cir. 2005) ("Reinstatement pending a trial on the merits . . . is an extraordinary remedy permissible only upon a substantial showing of irreparable injury."). Jones's only response to *Webb* and similar authorities is that he does not seek reinstatement but rather an order forcing the Board not to accept his resignation or to acknowledge that he has not resigned. Whatever legal theories he presses, as a factual matter, Jones is not currently working at Franklin, so the relief he seeks is reinstatement, to which these principles apply.

There are other reasons that an injunction is not warranted. First, reinstating Jones on an interlocutory basis would disturb the Board's decision to find a new principal for Franklin. Second, if he were reinstated, the Board would certainly proceed under the School Code to terminate Jones. Thus, interlocutory relief would be ephemeral for Jones, who could be immediately suspended without pay pending a dismissal hearing. 105 Ill. Comp. Stat. 5/34-85(a)(1). Finally, there are other stakeholders in this dispute—Franklin teachers and staff, students, parents, and the Local School Council—many of whom would likely be distressed to have Jones at the school while criminal charges are pending against him. At the least, the court is not persuaded that the public interest would be served by the requested order.

## **ORDER**

The motion for temporary restraining order (dkt. 10) is denied.

Date: September 10, 2020

_____
U.S. District Judge Joan H. Lefkow